No. 103,698

In the Matter of NANCY F. ORRICK, *Respondent*.

(233 P.3d 257)

Opinion filed June 11, 2010.

*Kimberly L. Knoll*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio Chtd., of Topeka, argued the cause, and *Nancy F. Orrick*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the Disciplinary Administrator's office against the respondent, Nancy F. Orrick, of Overland Park, Kansas, an attorney admitted to the practice of law in Kansas in 1988.

On November 6, 2009, the Disciplinary Administrator's office filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). Respondent filed an answer to the formal complaint on November 25, 2009. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on December 3, 2009, where the respondent was personally present and represented by counsel. The hearing panel determined respondent violated KRPC 1.5(a) (2009 Kan. Ct. R. Annot. 460) (fees must be reasonable); 3.3(a)(1) (2009 Kan. Ct. R. Annot. 545) (false statement made to tribunal); and 8.4(c) (2009 Kan. Ct. R. Annot. 602) (engaging in conduct involving misrepresentation). The hearing panel recommended a 60-day suspension and a mandatory reinstatement hearing. We find there is clear and convincing evidence supporting the violations but order a 2-year suspension and a reinstatement hearing because the misrepresentations were knowingly made as detailed below.

On June 20, 2006, respondent was appointed to serve as the guardian ad litem in *In re J.M.*, a child in need of care case before the Honorable Kathleen Sloan. On May 26, 2008, respondent submitted a bill for $1,332.50 to the Johnson County District Court for 20.5 hours work on the case. The bill covered March 7, 2008,

through May 23, 2008. It contained 21 separate time entries. J.M.'s mother was ordered to pay the bill. In carefully reviewing the charges, she noticed incorrect entries, such as billing for corresponding with CASA after CASA's involvement was terminated. She investigated further by contacting others who were involved in her daughter's case to verify other time entries.

J.M.'s mother and her attorney notified Judge Sloan about the discrepancies, which were memorialized in a letter detailing 13 billing entries that appeared to be incorrect. Respondent was given a copy of the letter on July 25, 2008. That same day, respondent wrote Judge Sloan a letter regarding the allegations. On August 6, 2008, respondent provided a second letter, which included additional comments about the specific entries on the itemized bill and revising the amounts charged.

The hearing panel found respondent's bill contained significant misrepresentations on time entries made for March 18, 2008, May 1, 2008, and May 9, 2008, on the initial billing and also in respondent's follow up explanations about the billings in the letters to Judge Sloan. These were described in the following findings from the hearing report.

*"March 18, 2008*

"12. Initially, the Respondent submitted a bill for five hours for work performed on March 18, 2008, for having:

'Picked up [J.M.] in North Kansas City and brought her to KVC for meeting with myself and KVC, got her lunch and took her back to Aunt's House in North Kansas City'

"13. In the Respondent's July 25, 2008, letter to Judge Sloan, the Respondent stated the following regarding the March 18, 2008, entry:

'I can tell the Court that the original plan was for me to provide the transportation both ways and to feed her both ways. I thought I did but if Whitney says differently I believe her so my bill would be 3.0 Hours with travel time to and from my office and file review and prep. I know that I hung around awhile after meeting with [J.M.] waiting and hoping to talk with Whitney's supervisor or Mary Bowersock's — that was part of the reason that I did not take [J.M.] home but i do believe I gave [J.M.] money for lunch or at least tried to give her some money for lunch — but I was not able to make contact with Mary or the supervisor that day. I will have to admit that I do have a hard time distinguishing between my handwritten 3's and 5's.'

"14. In the Respondent's August 6, 2008, revised bill, the Respondent stated the following regarding her March 18, 2008, time entry:

'Time revised from 5 hours to 3 hours
Due to my error in reading my own
Handwriting
County reimbursed $130 to be applied
to lessen [J.M.'s mother]'s bill on 30 July 2008                    3.0'

"15. On March 18, 2008, the Respondent picked up J.M. from her aunt's house in North Kansas City and drove her to a meeting at KVC. The Respondent, however, did not drive J.M. back to her aunt's house following the meeting. It is clear from the circumstances, it can be inferred that at the time the Respondent submitted her bill to the Court on May 26, 2008, as well as at the time she wrote to the Court on July 25, 2008, and August 6, 2008, she knew that she had not driven J.M. back to her aunt's house in North Kansas City and she knew that she had not spent 5.0 hours on J.M.'s case that day.

*"May 1, 2008*

"16. The Respondent's May 26, 2008, bill included an entry for 1.1 hours for work performed on May 1, 2008, for the following:

'Went to [J.M.]'s school—she wasn't there—t/c KVC and left message for [J.M.]—met with school officials'

"17. In her July 25, 2008, letter to Judge Sloan, the Respondent stated the following regarding her May 1, 2008, billing entry:

'I drove to [J.M.]'s school that day and went to the front office and was told that [J.M.] wasn't in school that day. I did again leave a message for [J.M.] at school and was assured that [J.M.] would receive the same—that is what I mean when I say "Went to [J.M.]'s school and she wasn't there—left message for [J.M.] at school and met with school officials."

'I was not asked to sign in because I wasn't going further in the school. I did call KVC and spoke with either Mary, Whitney or a their [*sic*] supervisor because I was concerned that [J.M.] not being in school.'

"18. On August 6, 2008, the Respondent revised the language of her bill, but the amount of time billed remained unchanged, as follows:

'Drove to [J.M.]'s school and she wasn't there; spoke with school personnel (1st adult that I could find; left message for [J.M.] @ her school and phone conference with KVC re: not in school again and misc.           1.1'

"19. J.M. attended Blue Valley Northwest High School. On May 1, 2008, J.M. attended school, but was excused from attendance for one hour of that school day.

"20. If the Respondent had gone to Blue Valley Northwest High School to check on J.M. or to meet with the school officials involved with J.M., the Respondent would have had to obtain a visitor's pass and sign-in as a visitor. After

obtaining a visitor's pass and signing in as a visitor, the Respondent would have been directed to see Gretchen Steffen, J.M.'s school counselor, Julie Seitter, the school psychologist, or Steve Harms, a principal of the high school.

"21. Additionally, Blue Valley Northwest High School personnel does not release information regarding the attendance of students. [Footnote: At the hearing on this matter, counsel for the Respondent questioned Mr. Smithyman regarding the meaning of a 'guardian's order.' Counsel for the Respondent asserted that a 'guardian's order' would allow the Respondent to obtain information regarding her ward, including school records, medical records, etc. No evidence was presented to establish that the Respondent had a 'guardian's order' allowing her access to J.M.'s records or that if such an order existed, that it was presented to Blue Valley Northwest High School.]

"22. The Respondent did not obtain a visitor's pass, nor did she sign-in as a visitor on May 1, 2008. Further, neither Ms. Steffen, Ms. Seitter, nor Mr. Harms were contacted by the Respondent on May 1, 2008, or any other day. Finally, J.M. has never received a message from the Respondent at school.

"23. It is clear, from the circumstances, that it can be inferred that at the time the Respondent submitted her bill to the Court, on May 26, 2008, as well as when the Respondent provided her July 25, 2008, letter to the Court and when the Respondent revised her bill on August 6, 2008, she knew that she had not gone to Blue Valley Northwest High School on May 1, 2008, she knew that she did not meet with a school official that day, and she knew that she did not leave a message for J.M. that day.

*"May 9, 2008*

"24. On her original bill, the Respondent included an entry for May 9, 2008, for eight-tenths of an hour for work performed which was otherwise identical to the entry for May 1, 2008.

'Went to [J.M.]'s school—she wasn't there—t/c KVC and left message for [J.M.]—met with school officials'

"25. In her July 25, 2008, letter to Judge Sloan, the Respondent stated the following regarding the May 9, 2008, time entry:

'I drove to [J.M.]'s school that day and went to front office and was told that [J.M.] wasn't in school that day. I did again leave a message for [J.M.] at school and was assured that [J.M.] would receive the same—that is what I mean when I say "Went to [J.M.]'s school and she wasn't there—left message for [J.M.] @ school and met with school officials."

'No one ever asked me to sign in since I was [*sic*] going further into the school. I did call KVC and spoke with either Mary, Whitney or a their [*sic*] supervisor because I was concerned about [J.M.] not being in school. This bill is less because I knew where the school was that time and didn't get lost and have to call for directions again.' [Footnote: Despite the Respon-

dent's statement that she became lost on her way to J.M.'s school on May 1, 2008, at the hearing on this matter, the Respondent could not recall whether J.M. attended Blue Valley North High School or Blue Valley Northwest High School.]

"26. On August 6, 2008, the Respondent amended the language of the billing entry for May 9, 2008, but not her time, as follows:

'Drove to [J.M.]'s school and she wasn't there; spoke with school personnel (1st adult that I could Find) left another message for [J.M.] @ her school And phone conference with KVC re: not in school again and misc. 8'

"27. On May 9, 2008, J.M. attended school, but was excused for one hour of that school day.

"28. The Respondent did not obtain a visitor's pass nor did she sign in as a visitor on May 9, 2008. Again, neither Ms. Steffen, Ms. Seitter, nor Mr. Harms have had any contact with the Respondent. Further, J.M. has never received a message from the Respondent at school.

"29. It is likewise clear, from the circumstances, that it can be inferred that at the time the Respondent submitted her bill to the Court, on May 26, 2008, as well as when she wrote to Judge Sloan on July 25, 2008 and when she revised her bill on August 6, 2008, the Respondent knew that she had not gone to Blue Valley Northwest High School on May 9, 2008, she knew that she did not meet with a school official that day, and she knew that she did not leave a message for J.M. that day."

Based on these misrepresentations, the hearing panel concluded respondent violated KRPC 1.5, KRPC 3.3, and KRPC 8.4(c) as detailed below:

"2. KRPC 1.5(a) requires that a lawyer's fee be reasonable. Submitting a bill for time not spent on a case is not reasonable. Thus, when the Respondent charged Johnson County, and ultimately J.M.'s mother, for activity that she did not engage in, the associated fee is unreasonable. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.5(a).

"3. KRPC 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal.'

"4. In the Terminology section of the Kansas Rules of Professional Conduct, the Court states that 'knowingly' 'denotes actual knowledge of the fact in question.' The Court also stated that '[a] person's knowledge may be inferred from the circumstances.'

"5. While the Respondent denies 'knowing' that she provided a false statement to the Court by virtue of her billing statement, the Respondent's knowledge can certainly be inferred from the circumstances. The Respondent did not make a round-trip to North Kansas City on March 18, 2008. Thus, it can be inferred that

the Respondent's statement that she did in fact made a round-trip to North Kansas City was knowingly made.

"[6]. Further, because no school officials at Blue Valley Northwest High School met with the Respondent on May 1, 2008, or May 9, 2008, because the Respondent was completely unfamiliar with the visitor protocol for the school, because no message was left for J.M. by the Respondent, and because the Respondent neither signed-in nor received the visitor photo identification badge, it can be inferred from the circumstances that the Respondent knowingly provided a false statement to the Court when she included the May 1, 2008, and May 9, 2008, billing entries.

"[7]. As a result, the Hearing Panel concludes that the Respondent provided a false billing statement to the Johnson County District Court. For the reasons stated above, the Hearing Panel also concludes that the Respondent provided false information to the Court when she provided her July 25, 2008, and her August 6, 2008, letters to Judge Sloan. Because the Respondent provided false information to the District Court in her billing statement and in her July 25, 2008, and August 6, 2008, letters, the Hearing Panel concludes that the Respondent violated KRPC 3.3(a)(1).

"[8]. 'It is professional misconduct for a lawyer to . . . engage in conduct involving . . . misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved misrepresentations when she filed her May 26, 2008, billing statement, when she provided her July 25, 2008, letter to Judge Sloan, and when she provided her August 6, 2008, letter to Judge Sloan. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c)."

The hearing panel next considered the American Bar Association's Standards for Imposing Lawyer Sanctions (hereinafter "Standards"), before unanimously recommending a 60-day suspension and a reinstatement hearing. Pursuant to Standard 3, the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and any aggravating or mitigating factors are to be considered. Relevant portions of the hearing panel's analysis are included below.

"*Duty Violated.* The Respondent violated her duty to the legal system and the legal profession to maintain her personal integrity.

"*Mental State.* The Respondent knowingly violated her duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury to the legal system.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be

imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

*"Prior Disciplinary Offenses.* The Respondent has previously been disciplined on one occasion. On November 23, 1999, the Respondent was informally admonished for violating KRPC 1.3, KRPC 1.4, and KRPC 8.4(g).

*"Dishonest or Selfish Motive.* The Respondent engaged in dishonest conduct when she made misrepresentations to the Court. Accordingly, the Hearing Panel concludes that the Respondent's misconduct was motivated by dishonesty.

*"Substantial Experience in the Practice of Law.* The Respondent has substantial experience in the practice of law—she was admitted to the practice in 1988.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

*"Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* Evidence was presented that the Respondent, in addition to her medical problems described below, has personal and emotional problems. The Respondent suffers from dysthymia (chronic depression), marital problems, and neuropsychiatric manifestations of lupus and, in the past, has suffered serious personal trauma.

*"Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* Based upon a number of letters received by the Hearing Panel, the Respondent enjoys a good reputation among her peers in the Johnson County bar. It is important to note, however, Judge Sloan's testimony made it clear that the Respondent's previous reputation far exceeded her current reputation.

*"Physical Disability.* The Respondent suffers from numerous physical maladies.

. . . .

"On September 30, 2009, one of the Respondent's current physicians, Kevin Latinis, M.D., Ph.D., provided a letter detailing her diagnoses:

'I am writing this letter on behalf of my patient, Nancy Orrick. She is a 50-year-old female with a medical history that includes systemic lupus erythematosus, significant iron-deficiency anemia, recurrent Meniere disease, hearing loss, tinnitus, vertigo related to lupus, as well as neuropsychiatric manifestations of the lupus. I began caring for Nancy in September of 2007, at which time she had already been diagnosed with autoimmune hearing loss. I consolidated her diagnosis as lupus with most of her medical manifestations being accountable to this disease. Over the last two years, we have treated her with various medications targeting the immune system as well as attempting to stabilize her symptoms. Her main disease manifestations that compromise her general well-being include persistent and re-

current dizziness/vertigo, tinnitus (ringing in the ears), and cognitive dysfunction related to the neuropsychiatric lupus. These manifestations are quite debilitating and cause her to not be able to function in her full capacity. Clearly, as a lawyer, she is highly educated and has functioned at a very high level in society. However, with the onset and progression of this disease, she has had significant difficulty with the task necessary to maintain her position as well as to even function with some activities of daily living particularly those that included cognitive concentration. While I think we have made some progress to stabilize her disease, at this point, it is too early to say that we have reversed any aspects of it and more than likely, her lupus represents a chronic, ongoing, debilitating autoimmune disease. My goal as her physician is to first prevent progression of the disease, second stabilize her current symptoms, and third potentially reverse some of her medical issues. Although the latter is the ideal, this often can be difficult to achieve. I continue to follow her for monitoring of her complicated medication regimen as well as disease assessment, anticipating doing this in the long-term and short-term. If you have any specific questions regarding her medical issues and their effects on her daily capacities, please do not hesitate to contact me.'

Dr. Latinis did not testify at the Respondent's hearing.

. . . .

"From the Respondent's appearance before the Hearing Panel, it is clear that the Respondent's health problems have impacted her ability to practice law. The Hearing Panel observed what Dr. Latinis described: the Respondent had 'significant difficulty with' tasks that 'included cognitive concentration.' The Respondent's oral response time to questions posed during the hearing was significantly delayed. The Respondent was unable to track simple questions posed.

"From its observations, the Hearing Panel has significant concerns regarding the Respondent's current fitness to practice law.

"*Remorse*. At the hearing on this matter, the Respondent expressed genuine remorse.

"*Remoteness of Prior Offenses*. The Respondent's informal admonition is remote in time and character.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standard:

'6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.' "

DISCUSSION

Respondent elected not to file any exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(d) (2009 Kan. Ct. R. Annot. 337). This court holds the hearing panel's findings are supported by clear and convincing evidence, the standard required by Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321). Clear and convincing evidence is " 'evidence that causes the fact-finder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). The sole issue before this court is the appropriate discipline.

In determining the appropriate discipline, we cannot ignore the hearing panel's finding that respondent's actions were significant misrepresentations based upon a dishonest motive that amounted to knowing violations of her professional responsibilities. The hearing panel concluded in paragraphs 15, 23, and 29 that respondent: (1) knew her billing entries were false when she submitted them to the court; (2) repeated the dishonesty when the entries were questioned; and (3) knowingly gave the district court untruthful explanations to deflect those inquiries. Accordingly, we view this case as one involving a member of the bar committing multiple acts of dishonesty upon the district court.

The Disciplinary Administrator's office recommended to the hearing panel that respondent receive a 2-year suspension. The Disciplinary Administrator's office also recommended that prior to respondent being allowed to resume the practice of law that she undergo a reinstatement hearing pursuant to Supreme Court Rule 219 (2009 Kan. Ct. R. Annot. 376) to ensure she is physically, mentally, and emotionally fit. That position was renewed at oral argument. The hearing panel recommended a 60-day suspension with a reinstatement hearing. At oral argument, respondent urged us to adopt a 60-day suspension, but speculated that her physical and mental health would not permit her to seek reinstatement in the foreseeable future regardless of the suspension imposed.

We agree suspension is the appropriate discipline because respondent's misconduct was the result of multiple misrepresenta-

tions in her dealings with the district court. We find a 2-year suspension to be the appropriate length for respondent's discipline given the nature of her offenses and the undisputed findings that respondent knowingly gave the district court misleading explanations in response to inquiries after the initial misrepresentations were disclosed.

In addition, we share the serious concerns stated by the hearing panel and acknowledged by respondent regarding her present and future ability to practice law based upon her medical conditions and personal problems. Indeed, respondent questioned before this court whether her circumstances will ever permit her to practice law again. We find these concerns make it particularly appropriate to require a hearing under Supreme Court Rule 219—if respondent wishes to seek reinstatement after the suspension period.

Among the other issues set out for consideration under Supreme Court Rule 219(f), the reinstatement hearing panel specifically must consider and report to this court its evaluation as to: (1) respondent's medical, physical, and emotional health as it may affect her fitness to return to the practice of law; (2) if reinstatement is recommended, whether respondent's practice should be monitored by another attorney; and (3) if monitoring is recommended, any appropriate terms and conditions, including the time period for monitoring.

### CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Nancy F. Orrick be suspended from the practice of law in the state of Kansas for 2 years, effective the date of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2009 Kan. Ct. R. Annot. 272).

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218 (2009 Kan. Ct. R. Annot. 361), and in the event respondent seeks reinstatement, she shall comply with Supreme Court Rule 219 with consideration of the issues noted above in addition to any others provided under this rule.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.

Davis, C.J., not participating.

Richard B. Walker, District Judge, assigned. ▌